IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Debra V. Sox,                    )
                                 )        Civil Action No. 6:09-1609-KFM
                    Plaintiff,   )
                                 )              **O R D E R**
          vs.                    )
                                 )
Michael J. Astrue,               )
Commissioner of Social Security, )
                                 )
                    Defendant.   )
_____)

This case is before the court for a final order pursuant to Local Rule 73 and Title 28, United States Code, Section 636(c). The case was referred to this court for disposition by order of the Honorable Patrick Michael Duffy, United States District Judge, filed July 10, 2009.

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act.

## **ADMINISTRATIVE PROCEEDINGS**

The plaintiff protectively filed her application for supplemental security income (SSI) benefits on June 8, 2004, alleging that she became unable to work on March 2, 2004. The application was denied initially and on reconsideration by the Social Security Administration. On February 16, 2006, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, her attorney, and a vocational expert appeared on January 17, 2008, considered the case *de novo*, and on February 6, 2008, found that the

plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on May 28, 2009. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant has not engaged in substantial gainful activity since June 8, 2004, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).

> (2)    The claimant has the following severe impairment: narcolepsy (20 CFr 416.920(c)).

> (3)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

> (4)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she must avoid hazards such as unprotected heights and dangerous machinery; she must avoid extremes of temperature and humidity; and she must avoid sunlight.

> (5)    The claimant is capable of performing past relevant work as an accounting technician, a store manager, and a general salesperson. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

> (6)    The claimant has not been under a disability, as defined in the Social Security Act, since June 8, 2004 (20 CFR 416.920(f)), the date the application was filed.

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

**APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 43 years old on the date she claimed her disability began and 46 years old on the date of the ALJ's decision (Tr. 44).

The record reveals that the plaintiff has been diagnosed with narcolepsy, a sleep disorder that causes excessive sleepiness and frequent daytime sleep attacks (Tr. 228). To combat the impairment, the plaintiff's physicians prescribed a number of medications (*see, e.g.*, Tr. 164, 187, 227). After a period of time, the plaintiff began to experience allergic reactions from the medications in the form of a rash (Tr. 198-99, 202).

The plaintiff saw Dr. Richard Bogan, the Medical Director of a Sleep Disorder Center, from October 2002 to May 2006 (Tr. 217-32). Dr. Bogan attempted to treat the plaintiff with a number of different medications. At her last visit in 2006, he noted that the plaintiff still had excessive daytime sleepiness and fatigue, despite taking stimulants. He further noted that patients with excessive sleepiness will likely have mood disturbance, short-term memory difficulty, and difficulty with focus and concentration, which significantly impact quality of life and work performance (Tr. 217).

The plaintiff began seeing Dr. Rebecca Clemenz, a dermatologist, for treatment of her rash. Examination revealed inflammation with some ulceration and abrasion. Testing revealed a traumatized drug reaction and Dr. Clemenz thought that her rashes were caused by medication. Her physicians changed her medications, but the plaintiff's rashes continued (Tr. 162-65).

In addition to narcolepsy and allergic reactions to medication, the plaintiff claimed she had a mental impairment. Clinical notes from the physician's assistant working with her treating physician, Dr. J. Frank Martin, indicated treatment for depression (Tr. 211, 213). The plaintiff was taking anti-depressants from October 2003 to June 2004 and beginning again in March 2005 (Tr.195-96, 199, 208).

To address the impact of the mental impairment, the Commissioner asked a psychologist, John C. Whitley, Ph.D., to evaluate the plaintiff. Dr. Whitley's impression was pain disorder and dysthymia and he concluded that her mental impairments would not preclude work activity (Tr. 155-60).

The plaintiff also alleged limitations caused by neck pain. In March 2005, Dr. Martin suggested that she had a myalgia in the neck. He administered two injections and noted numerous injections from other physicians (Tr. 186, 195-97).

In November 2006, the plaintiff complained to Dr. Green Neal of myofascial pain that had begun in 1999. Examination was unremarkable, but Dr. Neal noted chronic muscle twitches (fasciculations) in the neck, upper back, and shoulders. Dr. Neal's assessment was fibromyalgia. He later referred to the plaintiff's condition at "severe fibromyalgia" and cited fibromyalgia in multiple areas (Tr. 269-74).

The plaintiff claimed at the hearing that she suffered an injury related to her narcolepsy in February 2004 (Tr. 315). She was seen by Dr. Sharon Rinsinger, on February 17, 2004, a day after her injury. The plaintiff reported that she had been injured by a metal roller when she was picking up boxes. Examination showed mild swelling over her head, a closed skin wound, and lumbar spine tenderness. Examination notes do not show that the plaintiff reported or that Dr. Rinsinger thought the injury was caused by narcolepsy (Tr. 204-06).

In February 2006, Dr. Martin wrote that the plaintiff had narcolepsy and severe side effects from the medications usually used to treat narcolepsy. He also wrote that the plaintiff had suffered cervical spine symptoms after a 1999 accident. He concluded that the plaintiff was unable to perform substantial gainful activity since 1999 and would be unable to do so in the future (Tr. 188).

6

In an undated form, Dr. Neal reported that the plaintiff could not work due to narcolepsy, depression, pain, and fibromyalgia (Tr. 269). In October 2007, Dr. Neal indicated that the plaintiff could perform significantly less than sedentary work (Tr. 265-67).

A State agency psychologist reviewed the plaintiff's medical records and found that her mental impairments were not severe (Tr. 245-58). A State agency physician reviewed the plaintiff's medical records and concluded that she could perform work at all exertional levels that allowed her to avoid hazards, extremes of temperature and humidity, and sunlight (Tr. 237-44).

At the hearing, the plaintiff testified that she lived with her 13-year-old daughter (Tr. 289). She said that she had graduated high school and earned a technical degree (Tr. 289). The plaintiff testified that she owned a vehicle (Tr. 290). She stated that, until 1994, she worked as a clerk (Tr. 293), when she became an accounting technician (Tr. 294). She said she stopped working when she had her second child (Tr. 294). She claimed that she was unable to return to a job that required sitting at a desk and staying awake (Tr. 294). Rather than seeking other employment, she chose to stay at home and raise her child to school age (Tr. 294). Contributing to her decision was the fact that child care was expensive (Tr. 294). She said that, when her children were older, she did not return to her accounting job because she was unable to stay awake (Tr. 294). She then began working for a zoo (Tr. 295). The plaintiff said that she had worked as a salesperson in 1997, but made no money (Tr. 308). She testified that she worked as a store manager from 2002 to 2004 (Tr. 290).

The plaintiff said she could not do her job due to narcolepsy (Tr. 291). She said she had been injured in a February 2004 accident in the stockroom and that the accident was caused by her narcolepsy (Tr. 291). The ALJ noted that there was nothing in the medical reports attributing the injury to narcolepsy (Tr. 202). The plaintiff said she was certain that the injury was caused by narcolepsy and that she believed she reported

that to her physicians (Tr. 293).  She said she tried to return to work after the accident, but she was unable to keep up with the paperwork, fell asleep at her desk, and had to take breaks and go to the car to take naps (Tr. 295).

The plaintiff testified that she had been diagnosed with narcolepsy in November 2002 (Tr. 292).  She said that she had sought treatment for narcolepsy and taken medication (Tr. 298).  She said that she did not have side effects from medication initially, but that she eventually developed allergies to the medication (Tr. 297).  She said she had skin rashes and was referred to a dermatologist, who determined that she was allergic to the medications (Tr. 297).  The plaintiff said the allergic reactions caused pits, holes, and pistules and that they were painful (Tr. 304).  She said she was no longer taking the medication, and therefore she no longer had the pain (Tr. 305).

The plaintiff testified that, due to her narcolepsy, she did not wake easily and that she had periods of sleepiness (Tr. 305). She also complained of headaches and pain in her neck, upper back, lower back, and shoulders (Tr. 305).  She said she had never been to the emergency room (Tr. 315).  She said that the only time she sought treatment for an injury caused by narcolepsy was in February 2004 (Tr. 315).  She said that narcolepsy had not caused any motor vehicle accidents (Tr. 315).

The plaintiff said that the physician treating her for narcolepsy was also treating her for depression (Tr. 299).  She said that she had not seen any mental health providers (Tr. 299, 306).  The plaintiff explained that she had lost her insurance and had to switch physicians, to the point that her last physician agreed to take her on as a patient even though she could not pay (Tr. 303).  She said she currently received care from a public hospital and was paying for treatment on a sliding scale (Tr. 304).

The plaintiff said that she went shopping once a week (Tr. 314).  She said that she drove one mile to the store (Tr. 314-15).  She said that she would also drive while doing

other errands, such as attending physician appointments, going to the bank, and picking up her daughter from school (Tr. 315).

Joel Leonard, a vocational expert, also testified at the hearing (Tr. 307). Mr. Leonard testified that the plaintiff's past work was as a store manager (*DOT* 187.167-046, light, skilled), general salesperson (*DOT* 279.337-054*,* light, semi-skilled), and accounting technician (*DOT* 216.482-010, sedentary, skilled) (Tr. 310). The ALJ asked Mr. Leonard to consider an individual who could perform work at all exertional levels, but who needed to avoid hazards, extremes of humidity and temperatures, and sunlight (Tr. 310). Mr. Leonard testified that the person could perform the plaintiff's past work (Tr. 311).

Plaintiff's counsel asked Mr. Leonard to consider a person who could not work in areas requiring attention (Tr. 311). Mr. Leonard said the person could not perform any work (Tr. 312). Mr. Leonard also said that a person who could not perform work activity one time per month could perform jobs, but being unable to perform work three times per month would preclude work (Tr. 312-13). Mr. Leonard testified that a person who fell asleep 10 to 15 minutes at one time, three times per day, could not perform work (Tr. 314).

## ANALYSIS

The plaintiff alleges disability commencing March 2, 2004. She has a high school education and some technical school. The ALJ found that the plaintiff's narcolepsy was a severe impairment. He further found that the plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: she must avoid hazards such as unprotected heights and dangerous machinery; she must avoid extremes of temperature and humidity; and she must avoid sunlight. The ALJ found that the plaintiff could perform her past work as a store manager, general salesperson, and accounting technician.

9

The plaintiff argues that the ALJ's opinion is not supported by substantial evidence and that the ALJ erred by (1) failing to properly consider the opinions of her treating physicians; (2) stating that her skin reactions were not extensive pursuant to Listing 8.04; (3) penalizing her for failing to have constant medical treatment due to her lack of finances: (4) failing to properly consider her subjective complaints; and (5) violating Social Security Ruling ("SSR") 00-4p.

### Treating Physicians

The plaintiff first argues that the ALJ failed to properly consider the opinions of her treating physicians, Dr. Frank Martin and Dr. Green Neal. The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p, 1996 WL 374188. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in

which he is rendering an opinion.  20 C.F.R. § 404.1527(d)(2)-(5).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion.  SSR 96-2p, 1996 WL 374188, *5.  As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

> Dr. Martin stated on February 22, 2006:
>
> Debra Sox is a long-term patient of our practice at Palmetto Family Medicine. Ms. Sox suffers from severe non-REM narcolepsy diagnosed per Dr. Bogan, sleep specialist and pulmonologist in 09/2002. Since that time, the patient has been tried on numerous medications. Unfortunately, the usual stimulants, i.e. Adderall and wakeful drugs such as Provigil, have caused numerous side effects including severe skin reactions and unfortunately the patient has been unable to take these medications. She has been placed on Concerta, which she is taking 3 times a day just to have several hours of wakefulness during the day. It should also be noted that the patient was involved in an auto accident in May of 1999 where she sustained a cervical strain as well as cervical radiculopathy. She has seen several pain specialists and has had numerous injections with minimal improvement. At this time, the patient is unable to hold any gainful employment secondary to her overwhelming narcolepsy and sleepiness, as well as chronic and constant neck and cervical radiculopathy pain. Her present medications include Concerta . . ., Cymbalta . . ., Flexeril . . ., Darvocet . . . and Relpax . . . for chronic and debilitating migraine headaches. It is my medical opinion that the patient will be unable to hold any gainful employment for the remainder of her life. Her conditions, unfortunately, are chronic and unrelenting.

(Tr. 188).

The ALJ found as follows with regard to Dr. Martin's opinion:

> In this case . . . the objective medical evidence does not support the conclusions of Dr. Martin . . . . First, with regard to Dr. Martin's letter, he did not identify specific functional limitations of the claimant that would establish disability. His clinical findings and those of other physicians treating the claimant do not support his conclusory finding of disability. In particular, none of his treatment notes for the claimant support his comments as to constant radicular neck pain since 1999, nor did he record such a history in his clinic notes prior to the letter.

(Tr. 23). As pointed out by the plaintiff, the main issue in this case is narcolepsy, not radiculopathy. In any case, Dr. Martin regularly noted the plaintiff's neck pain on numerous office visits and prescribed range of motion exercises, Vioxx, Flexeril, and Darvocet (Tr. 186, 188, 189, 192-93, 195-96, 215). Dr. Martin's treatment notes clearly show the plaintiff's significant problems from narcolepsy and the lack of any viable treatment for it due to her allergies (Tr. 186-216).

Dr. Green Neal completed an RFC form on October 10, 2007, stating that the plaintiff has severe narcolepsy and she goes to sleep without notice. Dr. Neal added that the plaintiff has classic fibromyalgia with over 19 trigger points. Dr. Neal stated that the plaintiff is totally disabled and he has no solution for her neuropathy and severe memory loss. He noted that his assessment described the plaintiff's condition since March 2004. He added that she has no repetitive ability secondary to severe pain from fibromyalgia. He concluded that the plaintiff could lift and carry less than ten pounds, stand and/or walk a total of less than two hours per day, and sit less than six hours per day (Tr. 265-66). Dr. Neal also stated the following with regard to the plaintiff's inability to take medications: "[Stimulants] cause her to have memory loss and disorientation. They do help with sleepiness but patient just can't tolerate" (Tr. 267).

The ALJ stated that he did not find the opinions of Drs. Martin and Neal to be supported by objective clinical findings or persuasive in evaluating the plaintiff's disability (Tr. 23). Specifically, with regard to Dr. Neal, the ALJ noted that Dr. Neal had not treated the plaintiff prior to November 2006 and, therefore, his opinion that described the plaintiff's condition since March 2004 was due little weight. Second, he noted that Dr. Neal thought the plaintiff should not drive, yet the plaintiff said that she did drive. Third, the ALJ stated Dr. Neal's opinion was inconsistent with the objective evidence. The ALJ noted that while Dr. Neal wrote the plaintiff had 19 trigger points indicative of fibromyalgia, there was no evidence of the trigger points in the clinical records (Tr. 23). Furthermore, the ALJ stated Dr. Neal's assessment of the plaintiff's mental limitations was inconsistent with the findings of a consultative examiner, Dr. John Whitley.

On November 13, 2006, Dr. Neal stated in the plaintiff's treatment note: "This appears to be a classic case of narcolepsy. I was hoping that she could take Provigil but she is allergic to it so that makes the treatment much, much worse and the prognosis much worse" (Tr. 273). On January 5, 2007, Dr. Neal noted that "she is still totally disabled, has a severe sleeping pattern disturbance in which she oversleeps. She is not able to afford the Concerta. . ." (Tr. 271). On July 10, 2007, Dr. Neal's treatment notes state:

> She was unable to take the Concerta because she broke out just like she did with Adderall and Ritalin in the past. She has extensive scarring with pigmentation on her arms secondary to breaking out. Basically her narcolepsy is not able to be treated at this particular point. She also has allergic reaction to Codeine, Morphine, and Provental. All of this cause cutaneous reactions. She is not really able to tolerate much as well . . . There is no doubt she has narcolepsy, sleep apnea has been confirmed by other physicians as well as myself. The problem is that she has been intolerant to drugs. She has no funds at this particular point to undergo desensitization therapy to see if we can even get her to a point that she can take something.

(Tr. 269).

On August 13, 2007, Dr. Neal stated:

> She is still sleeping a lot consistently with active pain still. We tried her on some Concerta but she broke out with eruptions all over. The same thing happened with Adderall...She is seen today basically unchanged and totally disabled at this point. The reason for disability is: (1) She has a chronic pain syndrome that prevents her from concentrating; (2) She has a sleep problem in which she just drops off to sleep; (3) She is unable to really do much due to the combination of these problems plus her multiple allergies, we are not able to give her anything to effectively combat her sleeping disease. She is on muscle relaxant and Celebrex but without any resolution of her basic problems at this point.

(Tr. 268).

The ALJ stated in his opinion: "Her allergic reactions have certainly complicated treatment of that condition, but she has obtained relief for significant periods from some medications before side effects occurred" (Tr. 22). The evidence before the court shows, however, that while the side effects did not start instantly, the effectiveness of the medications was similarly delayed (Tr. 297). Once the plaintiff started a regular regimen of treatment, the side effects are well-documented by her physicians. Over a period of time, the plaintiff developed allergies to all medications available for narcolepsy (Tr. 268, 269, 297). Furthermore, Dr. Neal noted that the narcolepsy medicine not only was intolerable to the plaintiff, it also caused memory loss and disorientation (Tr. 267).

The ALJ stated Dr. Neal's RFC Form's finding of fibromyalgia was invalid because "his clinic notes contain no such findings or discussion." However, on November 13, 2006, Dr. Neal's clinic note found "chronic fibromyalgia" resulting in pain in the muscle groups of the neck, the medical scapula and the shoulders, and that she had failed a trial of Prednisone for it (Tr. 274). Similarly on July 10, 2007, Dr. Neal's clinical note discusses "extensive fibromyalgia in multiple areas" (Tr. 269). On August 13, 2007, Dr. Neal's clinical note discusses "active pains still," which appears to refer back to the prior clinical notes (Tr. 268).

14

The ALJ also found that since Dr. Neal did not treat the plaintiff before November of 2006, his retrospective opinion relating disability back to 2004 was automatically entitled to no weight: "Since he had never examined the claimant prior to November 2006, his assessment of her capacity over two and a half years previously is worthy of essentially no weight" (Tr. 23; *see* Tr. 265). However, as argued by the plaintiff, Fourth Circuit case law makes it clear that a treating physician may rely on prior treating physicians in rendering his opinion. Dr. Neal's reports (Tr. 137-51) clearly demonstrate that he had read in detail the reports of Dr. Bogan, a sleep specialist, which go all the way back to 2002 (*see* Tr. 266). As was explained at the hearing by the plaintiff, Dr. Neal was consulted because he took charity patients, and the plaintiff's insurance no longer covered any of her prior physicians. Dr. Neal's notes clearly demonstrate that he consulted the notes of the prior treating physician. In *Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987), the Fourth Circuit held that a physician's report that was based largely on the claimant's medical history and was hearsay in nature should have been considered on a claim for disability. An ALJ should consider the length of the treatment relationship as one of the factors in determining the weight to be given to a treating physician's opinion if it is not given controlling weight. However, simply disregarding outright Dr. Neal's opinion of the plaintiff's impairments prior to 2006 was in error.

Here, Drs. Neal and Martin's opinions of the plaintiff's disability due to narcolepsy and the lack of any treatment for her narcolepsy due to her allergies appear to be supported by their treatment notes. Furthermore, the ALJ failed to comply with SSR 96-2p in failing to consider the above-stated factors and explain the weight he gave the treating physician's opinions, even if he did not afford them controlling weight. Upon remand, the ALJ is instructed to re-evaluate the opinions in accordance with the above-cited law.

### *Listing 8.04*

The plaintiff next argues that the ALJ erred in finding that her skin condition did not meet or equal the Listings. The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d). A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, C.A. No. WMN-99-3696, 2000 WL 1916316, *9 (D. Md. 2000) (finding that where there is "ample factual support in the record" for a particular listing, the ALJ should perform a listing analysis).

A claimant meets Listing 8.04 if she can show: "chronic infections of the skin or mucous membranes, with extensive fungating or extensive ulcerating skin lesions that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R. Pt. 404, subpt. P, app. 1, § 8.04.

In his decision, the ALJ stated as follows:

> The claimant's attorney has argued that the claimant equals the requirements of Section 8.04 of the Listing of Impairments . . . . He acknowledges that she does not meet that Listing, because her skin condition occurs only when she is taking medications and she is not taking any of those medications now. The treatment notes of Dr. Clemenz, the claimant's treating dermatologist, did not demonstrate extensive (as that term is defined in the listings) fungating or ulcerating skin lesions when the claimant was experiencing her allergic reactions to various medications for narcolepsy. In addition, those notes tended to describe improvement in the skin lesions with medications prescribed for treatment of that condition, not just with cessation of the narcolepsy medications. Those circumstances do not support a conclusion that the claimant equals the requirements of Section 8.04 of the Listing of Impairments.

(Tr. 17-18; *see* Tr. 123).

16

As found by the ALJ, the plaintiff's counsel admitted her condition did not meet the requirements of Listing 8.04. The plaintiff argues, however, the ALJ failed to properly evaluate whether her impairments equaled the listing. This court agrees. An impairment or combination of impairments may "equal" a listing "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). However, merely "coming close" to meeting a listing is not enough to establish equivalence, and a claimant cannot establish equivalence merely by showing that the overall functional impact of his combination of impairments is as severe as that of a listed (i.e., presumptively disabling) impairment. *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). Instead, the claimant must present medical findings equal in severity to every criterion in a listing. *See id.*

In SSR 96-6p, the Social Security Administration stated:

The administrative law judge or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled. As trier of the facts, an administrative law judge or the Appeals Council is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments. *However, longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.*

The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants

may record their findings, may also ensure that this opinion has
been obtained at the first two levels of administrative review.

> *When an administrative law judge or the Appeals Council finds
> that an individual s impairment(s) is not equivalent in severity to
> any listing, the requirement to receive expert opinion evidence
> into the record may be satisfied by any of the foregoing
> documents signed by a State agency medical or psychological
> consultant.*

SSR 96-6p, 1996 WL 374180, *3 (emphasis added). *See Kelly v. Astrue*, C.A. No. 5:08-cv-289-FL, 2009 WL 1346241, *14 (E.D.N.C. 2009) (noting that "[t]he regulations discussing medical equivalence require the ALJ to consider the opinion of one or more medical or psychological consultants designated by the Commissioner when determining whether an impairment medically equals a Listing.") (citing 20 C.F.R. § 404.1526(c) and SSR 96-6p).

Here, the ALJ made no reference to any document in the record in which a state agency physician addressed whether the plaintiff's alleged impairments equal a listing. A review of the record shows that a state agency physician did review the plaintiff's medical records (Tr. 237-44). However, the Physical Residual Functional Capacity Assessment form does not show that the physician considered whether the plaintiff's impairments equal a listing (*see* Tr. 237-44). Upon remand, the ALJ is instructed to obtain a medical expert opinion on the issue of equivalence. Further, the ALJ is instructed to comply with the above-cited law in explaining his findings on this issue.

***Medical History***

The plaintiff next argues that the ALJ erred in penalizing her for failing to have constant medical treatment due to her lack of finances. Social Security Ruling 96-7p provides in pertinent part:

> [T]he individual's statements may be less credible if the level or
> frequency of treatment is inconsistent with the level of
> complaints, or if the medical reports or records show that the

individual is not following the treatment as prescribed and there are no good reasons for this failure. However, *the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.* The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility. *For example: . . . The individual may be unable to afford treatment and may not have access to free or low-cost medical services. . . .*

SSR 96-7p, 1996 WL 374186, **7-8 (emphasis added).     The Fourth Circuit Court of Appeals has stated: "A claimant may not be penalized for failing to seek treatment she cannot afford; '[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'" *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984)).

In his decision, the ALJ found as follows:

The clinical picture reflected in these treatment records shows rather limited objective findings to support the degree of limitations asserted by the claimant. . . .   She has followed a somewhat erratic course of treatment, with some long periods between doctor visits and different medications prescribed by different doctors at about the same time.

(Tr. 22).

The plaintiff argues that the ALJ drew a negative inference in evaluating her credibility without considering her indigency as the reason why she stopped seeing Drs. Bogan, Clemenz, and Martin.  The plaintiff notes that the record shows she stopped seeing Dr. Clemenz because she lacked funds (Tr. 85, 302).  Similarly, on November 13, 2006, Dr. Neal noted that her Medicaid stopped because her child support was just a little too much

and so now she had no way of getting her medication (Tr. 272). On January 5, 2007, Dr. Neal noted that the plaintiff was still unable to get her medication due to funds (Tr. 271). Similarly, on July 10, 2007, Dr. Neal noted that she was unable to get laboratory work because it was too expensive. Dr. Neal also stated on the same date that because the plaintiff was applying for Social Security, she was unable to get her lab work done under the Richland Care Card because applying for Social Security is a condition that suspends the card (Tr. 269). The plaintiff testified that she stopped seeing Dr. Bogan because she lost her insurance and she could not afford to see him (Tr. 298). The plaintiff also testified that she stopped seeing Dr. Martin because "I didn't pay them and I didn't have insurance to pay them" (Tr. 301).

The plaintiff further argues that the ALJ's questioning at the hearing showed that he did not want to hear any information about her indigency:

> Attorney: After you lost all the insurance and you couldn't see Bogan, Martin, and Clemenz, how was it that you got to be seen by Dr. Neal without insurance?
>
> Claimant: A friend of mine, who was a patient of Dr. Neal's, was concerned about me not having any insurance, not able to see any doctor, and she discussed with me at one of her visits my situation. He felt that maybe he could help me and would like to take me on as a patient.
>
> ALJ: Ok, that's the long explanation, what's the short explanation? You got in on a friend's-
>
> Claimant: And he suggested that I go to Richland.
>
> ALJ: Is that right, a friend had you seen by Dr. Neal for no charge?
>
> Claimant: I was trying to explain sir. I don't know any shorter way to do it.
>
> ALJ: Well yes or no ma'am?
>
> Claimant: She talked to him.

20

ALJ: Were you paying Dr. Neal?

Claimant: He suggested that I go to Richland Community Center and apply.

Attorney: You Honor-

ALJ: Did you ever pay Dr. Neal for any visits, ma'am?

Claimant: Yes.

ALJ: Ok, thank you. Anything further counsel, along that line?

Attorney: Do you receive subsidized help for seeing Dr. Neal through Richland County?

Claimant: Yes, I am on a sliding fee scale.

Attorney: All right, was that arranged through the friend of yours that knew Dr. Neal?

Claimant: No, it was arranged through Richland Community Center.

Attorney: Was it–

ALJ: Ok, there we go. That's the– we didn't need the rest of that.

Attorney: Ok, all right.

ALJ: Thank you.

Attorney: I'm sorry.

(Tr. 303-304).

The defendant argues that the ALJ did not "hold this against [the plaintiff] in assessing her credibility . . . . Instead, it was an accurate observation regarding Plaintiff's treatment. Moreover, the ALJ did not treat this as a negative factor. It simply is what it is: an observation of Plaintiff's course of treatment" (def. brief 10-11). However, the ALJ's discussion of the plaintiff's "erratic course of treatment" is located in the midst of his analysis of the plaintiff's credibility (*see* Tr. 18-22). Further, the ALJ did not consider the

21

explanation the plaintiff gave, lack of funds, for ceasing to see certain doctors. Upon remand, before drawing any negative inferences about the plaintiff symptoms and their functional effects from her irregular medical visits, the ALJ is instructed to consider the plaintiff's explanation along with the evidence in the case record supporting the explanation.

### Subjective Complaints

The plaintiff next argues that the ALJ failed to comply with the two part test for evaluation of symptoms. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual

and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id*. at *3.

After citing the law, the ALJ stated:

After considering the evidence of record, I find that the claimant's medically determinable impairment could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not substantiated by the total evidence of record and are not entirely credible.

(Tr. 19). The ALJ then went on to cite certain medical evidence (Tr. 19-22). Later in his decision, he found:

While her diagnosis of narcolepsy has been established, there is little evidence of the type of sleeping episodes she has alleged. Her allergic reactions have certainly complicated

23

treatment of that condition, but she has obtained relief for significant periods from some medications before side effects occurred. . . .

In evaluating the claimant's credibility, I must again note the limited findings to support the degree of limitations she asserted. Although the claimant stated that she is certain that narcolepsy was the cause of her injury at work in February 2004 and that she told her doctors that, the contemporaneous records of her medical treatment for that injury do not support that claim. . . . In describing her previous job before the store manager position in which she was injured, she stated that she left the job because she was unable to stay awake. However, she also stated that she chose to stay home and raise her children. She remained out of work until her children were in school, then she chose to and did return to work.

(Tr. 22).

The plaintiff argues that the ALJ never explained which symptoms were inconsistent with the objective medical evidence. This court agrees with the plaintiff that the ALJ should have been clear in his analysis in identifying the symptoms he found could and could not reasonably be expected to be produced by the plaintiff's impairments. The plaintiff further argues that the ALJ's "rejection of the plaintiff's symptoms was based primarily on a laundry list not so much of activities of the plaintiff, but of choices that the plaintiff has made in her life" (pl. brief 17). The ALJ did not err in considering the reasons given by the plaintiff for leaving her previous job in assessing her credibility. Further, the ALJ did not err in considering inconsistencies between the plaintiff's testimony and the contemporaneous medical records for her injury in 2004. However, the ALJ's conclusion that the plaintiff "obtained relief for significant periods from some medications before side effects occurred" does not appear to be supported by the record. As the plaintiff testified, there was a lag time before the medications took effect: "Initially, I didn't have side effects, they just weren't very effective in doing the job. Over a period of time, taking the medications, I developed allergies to all medications that are available for narcolepsy" (Tr.

24

297; *see also* Tr. 268, 269). Upon remand, the ALJ is instructed to evaluate the plaintiff's credibility in accordance with the foregoing discussion and the above-cited law.

### SSR 00-4p

Lastly, the plaintiff argues that the ALJ erred in finding that the vocational expert's testimony was consistent with the *Dictionary of Occupational Titles* ("DOT"). "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). Social Security Ruling 00-4p provides in pertinent part:

> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, *3.

Social Security Ruling 00-4p states that a reasonable explanation that may provide a basis for relying on the evidence from a vocational expert rather than on the DOT information may be based on the vocational expert's personal experience in job placement or career counseling. *Id*. at *2. *See Fisher v. Barnhart*, 181 Fed. Appx. 359, 365-66 (4th Cir. 2006) (unpublished)). Neither the DOT nor vocational expert testimony automatically "trumps" when there is a conflict. The ALJ must resolve the conflict by determining if the

explanation given by the vocational expert is reasonable and provides a basis for relying on the testimony rather than on the DOT.

The vocational expert testified that a person with the residual functional capacity described by the ALJ could perform the plaintiff's past work (Tr. 311). The residual functional capacity included the following limitations: avoid hazards, avoid changes in temperature and humidity, and avoid sunlight (Tr. 310). The plaintiff contends that the vocational expert's testimony was not consistent with the DOT because the DOT does not contemplate falling asleep without notice or chronic pain (pl. brief 20-21). The residual functional capacity assessment from the ALJ did not include the plaintiff's alleged limitations at the level of severity she contends as the ALJ did not find them to be supported by the evidence of record or credible (Tr. 24). However, as discussed above, the ALJ has been directed on remand to reconsider his analyses of the listings, the treating doctors' opinions, and the plaintiff's credibility. Should vocational expert testimony be necessary after that reconsideration, the ALJ should inquire about any possible conflicts between the expert's testimony and the information provided in the DOT and obtain an explanation for any such conflict.

## CONCLUSION

Based upon the foregoing, the Commissioner's decision is reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/Kevin F. McDonald
United States Magistrate Judge

July 2, 2010

Greenville, South Carolina